# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex rel.**<br>  **FRANK M. CASSADAY,** | ) ) ) | |
| *Qui Tam* **Plaintiff,** | ) ) | |
| **v.** | ) ) | No. _07 cv 1485_ |
| **KBR, INC.,**<br>**KELLOGG, BROWN AND ROOT SERVICES, INC.,**<br>**and**<br>**SERVICE EMPLOYEES INTERNATIONAL, INC.,** | ) ) ) ) ) | |
| **Defendants.** | ) ) | **FILED UNDER SEAL** |

## COMPLAINT

1.    This action concerns false claims submitted by the largest U.S. Army contractor, while providing a wide range of support services to the U.S. Army and other U.S. Armed Forces during the War in Iraq.   These services include camp maintenance and repair of equipment; the preparation, serving, and storage of food and ice; laundry services; and other vital support necessary for sustaining U.S. soldiers in Iraq.   Fraud and theft by this contractor have directly and tangibly undermined the U.S. war effort in Iraq, endangered U.S. troops, and defrauded the U.S. taxpayer.

2.    As explained in detail below, the Defendants profiteered:

- by theft of U.S. Government property, including weapons, ammunition, equipment and supplies, with items being stolen to sell to Iraqi buyers and insurgents;

- by routinely charging the U.S. Army for hours not worked, when KBR

employees were shopping, working out at the gym, calling the United
States at taxpayer expense, "surfing the Web," and watching pornography
on KBR-supplied TVs;

- by inflating contract performance figures; and

- by woeful overstaffing, cronyism and mismanagement.

3.      On one occasion alone, Defendants' theft included 12 large detonators for 155mm
artillery rounds (each the size of a hand grenade), over 200 rounds of ammunition for a machine
gun known as a squad automatic weapon ("SAW") and 800 rounds of other ammunition, as well
as large bullet-proof armor.

4.      When *Qui Tam* Plaintiff Cassaday complained about this to the Defendants, the
Defendants greeted this with hostility, threats, transfers, demotions, dangerous assignments, so-
called "protective custody," and ultimately constructive discharge.


## PARTIES

5.      The *Qui Tam* Plaintiff is Frank M. Cassaday ("Cassaday").  Cassaday is a citizen of the
United States, and the State of Ohio.  He resides at 405 W. Ely Street, Alliance, Ohio 44601.  In
accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.* (2000), Cassaday brings this
action on behalf of, and in the name of, the United States.

6.      Defendant KBR, Inc. is a Delaware corporation, registered to do business in the State of
Texas.  KBR, Inc.'s principal office is located at 601 Jefferson Street, Houston, Texas 77002.
That address is within this judicial district.  KBR, Inc. owns and controls the other Defendants;
performs services for them (such as finance and human relations services) that are directly
relevant to the misconduct alleged; submitted or caused the submission of the false claims at

2

issue; is liable for a corporate guarantee of performance under the relevant contract; and otherwise is liable for the claims asserted.

7.      Defendant Kellogg Brown and Root Services, Inc. is a Delaware corporation. KBR, Inc. wholly owns it. It does business at 4100 Clinton Drive, Houston, Texas 77020, and at other locations within this judicial district. It is the awardee of the government contract at issue.[1] It submitted or caused the submission of the false claims at issue, and is otherwise liable for the claims asserted.

8.      Defendant Service Employees International, Inc. ("SEII") is a Cayman Islands corporation. The former parent company of KBR, Inc., *i.e.,* Halliburton, Inc., identified it as a subsidiary in filings with the U.S. Securities and Exchange Commission. On information and belief, it does business at 4100 Clinton Drive, Houston, Texas 77020, and at other locations within this judicial district. In order to avoid liability under U.S. tax and labor laws, when KBR, Inc. and Kellogg Brown and Root Services, Inc. have hired contract employees for work overseas, they frequently have diverted those employees to employment by SEII. On information and belief, the *Qui Tam* Plaintiff and many other employees described herein, whose work was billed to the U.S. Government, were SEII employees, at least nominally. SEII submitted or caused the submission of the false claims at issue, and is otherwise liable for the claims asserted.

9.      The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, is expansive in imposing

---

[1] Specifically, it is not the original awardee, but rather a successor. The legal entity that was the original awardee, and its affiliates, have experienced a variety of corporate reorganizations and transformations since the time of award, including an asbestos-related bankruptcy petition, and a recent well-publicized divestiture by corporate parent Halliburton, Inc. These contortions notwithstanding, the conduct described in this Complaint is fairly attributed to each Defendant, or each Defendant is otherwise liable for it, as specifically alleged.

liability upon multiple defendants.  For instance, it holds liable not only those who knowingly present false or fraudulent claims to U.S. Government employees, but also those who knowingly cause such claims to be presented.  *Id.* § 3729(a)(1).

10.    The Defendants are referred to collectively as "KBR."  The actions and omissions ascribed herein to KBR are fairly attributed to each of them.


## JURISDICTION AND VENUE

11.    This action arises under the FCA, 31 U.S.C. § 3729 *et seq.*  Therefore, this is a case or controversy arising under the laws of the United States.  Hence there is subject matter jurisdiction under 28 U.S.C. § 1331 (2000).

12.    This action may be brought in this judicial district under 31 U.S.C. § 3732(a) (2000) because, *inter alia*, at least one of the Defendants transacts business in this judicial district, and can be found in this judicial district, and the alleged violations occurred in this district.


## ALLEGATIONS

### I.    LogCAP Waste, Fraud and Abuse

13.    The contract activities described in this Complaint have taken place under KBR's "LogCAP III" Contract ("LogCAP").[2]  LogCAP, including the billing under the contract, is discussed in substantial detail in Parts III and IV of this section of the Complaint, *infra.*

14.    Since the U.S Army occupation of Iraq began in March 2003, the U.S. Army has required KBR to construct, manage and maintain scores of military camps throughout the country, under

---

[2] In this complaint, the term "LogCAP" refers to the obligations flowing from the award of the LogCAP III Contract, while the term "LogCAP Contract" refers to the actual written agreement embodying those obligations.

LogCAP.   Part of this responsibility includes managing and operating ice plants, laundry services, dining facilities and satellite operations at and around U.S. military installations at Al Asad and Fallujah in Iraq.

15.    Al Asad Forward Operating Base is located at the second largest air base in Iraq.  It is northern Iraq, approximately 112 miles from Baghdad.  The air base was built by the Iraqi government, and funded by Yugoslavia, in the early 1980's.  At that time, the air base was considered a state-of-the-art facility, with one of the most sophisticated hospitals in Iraq.  Because of the pre-war "no-fly zone," it was largely abandoned in the mid-1990's, but much of its infrastructure remained intact.

16.    Fallujah is a large town 40 miles west of Baghdad.  There are a number of U.S. military camps located in the vicinity.  The U.S. Army operates Camp Baharia and Forward Operating Bases Volturno and Laurie near there.

17.    *Qui Tam* Plaintiff Cassaday is a professionally trained Power Pro technician, with decades of experience and expert knowledge of refrigeration technology and ice machines.  He graduated in 1969 from a technical school located in Los Angeles, California.

18.    KBR employed Cassaday from on or about July 3, 2004, until on or about May 24, 2005.  KBR assigned Cassaday to work at ice plants, operate small truck-mounted ice makers, and maintain and repair refrigeration equipment and ice machines at facilities in Iraq.

19.    Although Cassaday's assignments took him to many different locations, the focus of his work for KBR was in and around Al Asad and Fallujah.

20.    Cassaday was a skilled and dedicated employee.  He went to Iraq hoping to serve KBR for years to come.

21.    The refrigeration equipment on which Cassaday worked most often was used to store and

5

transport food to be consumed by U.S. soldiers. If the equipment failed, then the food rotted, and the soldiers would be forced to resort to rations (a/k/a MREs, or "meals ready to eat").

22.    The ice-making and ice-storing equipment on which Cassaday worked also was very important. In summer in Iraq, temperatures reach as high as 120 degrees Fahrenheit. This leaves U.S. soldiers prone to heat stroke, and other heat-related maladies. To try to avoid these, and to maintain fighting capability, alertness and morale, they must consume cool liquids frequently. Hence it is essential that potable ice be available. The LogCAP Contract (which, as noted below, predates the War in Iraq), specifically calls for the provision of potable ice.

23.    While deployed in Iraq by KBR, Cassaday personally witnessed several different means by which KBR falsely charged for services that were not performed, or performed in such a way that the service caused undue costs to the US military, as well as means by which KBR charged for services that were never delivered.

24.    On information and belief, the false and fraudulent conduct alleged in this Complaint preceded Cassaday's period of service in Iraq; it has continued during LogCAP performance after Cassaday left Iraq; and, absent action by the Court, it will continue during the pendency of this action.


A.    **Theft of Government Property**

25.    LogCAP is a services contract, not a supply contract. It permits KBR to bill for labor, not to deliver goods. LogCAP authorizes KBR to purchase supplies, and bill them to the Government, only when the supplies are incidental to the performance of contract services. All supplies that KBR purchases or produces under LogCAP are government property.

6

### 1.    Theft of Ice at Al Asad

26.    Cassaday worked at an ice plant at Al Asad (the "ice plant").

27.    Both the ice plant and the ice produced by the ice plant are government property.  Under LogCAP, KBR bills for the labor needed to operate the ice plant, plus the purchase of incidental supplies.

28.    The ice produced at the ice plant was a commodity with a substantial value.

29.    Knowing this, KBR's ice plant staff regularly stole the ice, and sold it or bartered it.

30.    The KBR manager in charge of the ice plant was named Gabriel Montoya ("Montoya"). Montoya knew that ice plant employees under his supervision were stealing ice, and using it for personal gain.  He did nothing to prevent this.

31.    The ice plant maintained records of ice delivered to the U.S. military.

32.    KBR employees systematically overstated the delivery of ice in the tally sheets.  For instance, one bag of ice was recorded as 10 or 15 bags, and two bags were recorded as 20.  KBR did this to facilitate and cover up the theft of ice for sale and barter.

33.    Montoya was aware that ice distribution records were false and inflated.

34.    In one typical case with which Cassaday was personally familiar, U.S. Marines at Al Asad were about to depart on a two-to-three-day patrol in heat approaching 120 degrees.  They asked for 28 bags of ice.  A KBR ice plant foreman gave them only three bags.  The foreman then recorded this in the tally sheets as 30 bags.

35.    Al Asad, like most U.S. bases in Iraq, has what is called a "haji shop."  The haji shop is, in effect, a convenience store, run by Iraqis, that specializes contraband and unconventional items.  These include cigarettes, fake brand-name sunglasses, pirated DVDs, illegal computer software copies, *etc.*

36.    The KBR ice plant foreman took the bags of ice that he had recorded as delivered to U.S. Marines to the Al Asad haji shop.  He then exchanged the bags of ice for other articles, which he kept.

37.    Such theft of government property at the ice plant was frequent.


## 2.    Stolen Equipment and Weapons at Fallujah

38.    As explained further below, KBR transferred Cassaday from Al Asad to Fallujah.  During his time in Fallujah, Cassaday witnessed additional KBR theft of government property.

39.    For instance, several KBR employees, including a KBR supervisor, a foreman and two other KBR staffers, stole refrigerators, freezers and a storage cabinet, in order to sell or barter them in the local Iraqi market.  The KBR employees brought these stolen items to KBR's camp, and hid them temporarily in what was called the KBR "lay down" yard.

40.    The same employees illegally diverted unauthorized ordnance and weapons.  Under LogCAP, the U.S. Army provides LogCAP employees with security, and LogCAP employees are not allowed to be involved in combat, so there was no conceivable justification for this.[3] This ordnance included 12 large detonators for 155mm artillery rounds (each the size of a hand grenade), over 200 rounds of ammunition for a machine gun known as a squad automatic weapon ("SAW") and 800 rounds of other ammunition, as well as large bullet-proof armor for vehicles and other items.  The KBR employees hid this ordnance and materiel in KBR "lay down" yard as well.

41.    Cassaday reported the stolen items and illegal possession of ordnance to a KBR Project

---

[3] On the contrary, KBR employees' use of such weapons would permanently identify them as combatants, with catastrophic consequences.

Manager named Clark. As alleged in more detail below, this led to Cassaday being stigmatized as a "snitch."

42.    U.S. Marines stationed nearby were tipped off about the stolen equipment and weapons. They launched a raid against KBR's "lay down" yard, to recover the equipment and weapons before they could be diverted to the black market.

### B.    Ice Plant Overstaffing and Non-Performance at Al Asad

43.    KBR vastly overstaffed the ice plant, and falsely charged the U.S. Government for this staff.

44.    Effective staffing for an ice plant of the size of the one at Al Asad requires only two skilled American workers and four third-country nationals ("TCNs") per shift.

45.    KBR employed at least 15 U.S. citizens and eight Indian TCNs at the ice plant.

46.    Montoya was well-aware that the ice plant was grossly overstaffed, and that ice plant employees were being paid while not working. He did nothing to correct the situation.

47.    Many ice plant employees on staff were routinely absent from work. They were paid as if they were present. Montoya and other KBR managers did not object to such employee absences because, due to overstaffing, such employees had little or nothing to do when they were present.

48.    Workers on the ice plant day shift regularly spent many hours of work time in the ice plant office, making personal phone calls to the United States on LogCAP lines, sending personal e-mails, and "surfing the Web."

49.    Ice plant employees also regularly spent three or four hours during the work day shopping at the Al Asad camp commissary and exchange (a/k/a the "PX"), getting haircuts,

9

visiting the gymnasium, and sightseeing. Montoya not only was aware of this, but he frequently invited his favorite employees to relax and "roam around" away from the ice plant.

50.     Ice plant employees were paid for (and, on information and belief, KBR billed their time for) 12-hour daily shifts. Yet Cassaday personally observed one or more ice plant employees refusing to work more than 40 hours a week.

51.     Cassaday also witnessed workers watching pornography on television. After a period of time, Montoya had the ice plant television removed, because military visitors might observe the television, *i.e.*, that KBR might get caught.

52.     Cassaday reported ice plant employee "slacking off" to Montoya. Montoya did nothing.

53.     On information and belief, KBR billed the full salaries of these workers, plus overhead, plus "fee," under LogCAP.

54.     On information and belief, KBR fraudulently charged the costs for ice plant employee recreational activity during work hours to the U.S. Government.

55.     On information and belief, KBR knowingly maintained an unnecessarily large ice plant staff so that it could overcharge the U.S. Government.


C.     **Ice Plant Cronyism and Unqualified Management at Al Asad**

56.     Due to overstaffing at all levels, KBR could and did select employees for promotion based on cronyism. Indeed, one of the primary rewards for collaborating in LogCAP waste, fraud and abuse is promotion. As a result, LogCAP supervisors lack essential knowledge. This results in woeful inefficiency and poor performance.

57.     At the ice plant, Montoya himself was inexperienced and unqualified.

58.     Montoya sought to promote a personal acquaintance who was a Porta-John (portable

toilet) truck driver to ice plant supervisor, with a salary of $120,000 a year.

59.     The fact that many KBR managers knew virtually nothing about the areas that they were managing led them to act defensive toward, and resent, KBR employees who actually knew what they were doing.  At the ice plant, for instance, a night shift employee known as Ray ("Ray") had been responsible for an ice plant in Houston, Texas, before going to Iraq under LogCAP.  Fellow workers called him "Mr. Ice," because of his experience and accomplished skills.  Ray tried to advise Montoya on how to palletize ice properly, for better production, and many other effective ice plant techniques.  This caused Montoya to resent Ray.

60.     At the ice plant, such resentment resulted in poor production, storage and distribution of ice.

### D.    Laundry Facility Overcounts at Fallujah

61.     On or about November 4, 2004, for reasons explained below, KBR transferred Cassaday to work at a LogCAP laundry facility in Fallujah.  His assignment there was to maintain and repair the washing machines and dryers.

62.     KBR maintained tally sheets to record the amount of laundry processed at laundry facilities.  These figures were systematically inflated.

63.     The inflation of these laundry figures evidently served two purposes.  First, it helped to conceal gross LogCAP overstaffing and featherbedding, particularly at the managerial level.

64.     Second, the inflated figures contributed to KBR's "P.R." effort.  For instance, in March 2004, KBR claimed to have processed more than one million bundles of laundry for U.S. soldiers in Iraq under LogCAP.  The actually figure would have been hardly impressive.

65.     On information and belief, KBR submitted such inflated figures to the U.S. Army, fraudulently seeking to obtain the maximum "earned" award fee under LogCAP, as discussed in detail below.


**E.      Laundry Facility Mismanagement at Fallujah**

66.     The washing machines and dryers at the laundry facility were woefully ill-equipped to meet the U.S. military's needs.  The machines were "stackables," of the type found in apartment complex laundry rooms.  They were not intended, or suitable, for round-the-clock commercial use.

67.     At times, only 50 percent of the washing machines and dryers were functional.

68.     Strangely, KBR had commercial washing machines stored in a warehouse during the time that Cassaday worked at the laundry facility, but KBR managers would not allow them to be moved to the facility and placed in service.

69.     Better equipment would have reduced the need for laundry labor, and KBR billed for that labor under LogCAP.

70.     Cassaday asked Clark to order parts needed to service and maintain the laundry machines in service.  They were never ordered.

71.     The laundry facility lost soldiers' laundry on a daily basis.

72.     KBR was well-aware of these deficiencies at the Fallujah laundry facility, but did not correct them.

## II.     Retaliation

73.     Cassaday, and other experienced ice plant employees, complained about the staffing and production problems and theft at the ice plant.  Montoya greeted these complaints with hostility and resentment.

74.     Montoya transferred Cassaday and the others to night shifts, as punishment.

75.     When Cassaday, and other experienced ice plant employees, continued to report these problems, including fraud by the foreman, KBR transferred them from Al Asad to Fallujah.

76.     The nominal excuse why Cassaday was sent to Fallujah was to help build a new ice plant there.  This plant was never built while Cassaday was in Iraq, but KBR billed the effort to the U.S. Government anyway.

77.     KBR employees, including Cassaday, regarded Fallujah as a more dangerous place to work than Al Asad.  In essence, KBR put Cassaday's life in greater danger because he would not "play ball."

78.     Cassaday was, if anything, overqualified for the laundry facility work.

79.     Turkish TCNs at the laundry facility ridiculed and harassed Cassaday.  KBR managers refused to take action to end this mistreatment.

80.     On or about one month after being transferred to Fallujah, Cassaday contacted higher-level management at KBR to report his observations of misconduct, and to complain about his mistreatment.

81.     A high-level KBR manager then visited Cassaday at Fallujah.  Cassaday gave a detailed report regarding the misconduct he had witnessed at the ice plant.  The KBR manager treated Cassaday's report as if it were foolish.

13

82.    After the U.S. Marines had recovered stolen equipment at KBR's facility in Fallujah, as alleged above, Clark "fingered" Cassaday as having informed the Marines.    Clark thus encouraged an extremely hostile work environment for Cassaday.

83.    Cassaday was then placed in what was referred to as "protective custody." He received only two meals a day, for four days.  He was not allowed even to go to the latrine without a security guard accompanying him.

84.    In the meantime, the KBR employees at Fallujah who had stolen government property were sent to Al Asad.

85.    Cassaday then was released from so-called "protective custody."    When Cassaday returned to work, KBR laundry workers treated Cassaday with extreme hostility.

86.    Graffiti defaming, impugning and threatening Cassaday appeared on the walls of Porto-Johns through the KBR camp at Fallujah.

87.    Cassaday was then transferred back to the Al Asad ice plant, notwithstanding his request to be transferred to anywhere in Iraq but there.

88.    Cassaday was constructively discharged.  On or around May 24, 2005, Cassaday found employment with another company as a refrigeration repair and maintenance expert.

89.    A KBR employee then e-mailed Cassaday's new employer on Cassaday's third day on the job, accusing Cassaday of being a "liar and troublemaker."    On information and belief, Montoya sent this e-mail.


**III.    The Logistics Civil Augmentation Program**

90.    The misconduct alleged above all took place under LogCAP.  The acronym LogCAP stands for "Logistics Civil Augmentation Program."  This U.S. Army program dates back to

14

1985. The U.S. Army Materiel Command, the U.S. Army Sustainment Command, and related U.S. Army and Department of Defense ("DoD") entities, have administered the program.

91.     KBR received the first contract awarded under this program, for work in Somalia, in 1992. KBR also received the third contract awarded under this program (*i.e.*, LogCAP III), which evolved into work focused in Iraq, Kuwait and Afghanistan. This third contract is the subject of this Complaint.

92.     The LogCAP Contract is Contract No. DAAA09-02-D-0007. On December 14, 2001, the U.S. Army's Operations Support Command, at Rock Island, Illinois, awarded LogCAP to Brown and Root Services, a division of Kellogg Brown and Root, Inc. The LogCAP Contract includes an express corporate guarantee by Kellogg Brown and Root, Inc.

93.     In or around 2003, KBR transferred its U.S. Government contracts to Defendant Kellogg Brown and Root Services, Inc. On information and belief, that collective transfer included LogCAP. KBR, Inc.'s former parent company, Halliburton, Inc., provided an additional performance guarantee. On information and belief, KBR, Inc., has assumed responsibility for that performance guarantee.

94.     Under LogCAP, KBR provides support for the construction of temporary military base camps, including infrastructure, billeting and dining; food preparation; drinking water; sanitation; showers; laundry; transportation; utilities; warehouses; travel for U.S. soldiers; *etc.* Essentially, KBR provides a wide variety of services in support of the U.S. Army that civilians are permitted to provide in military zones. KBR does this through employees and through subcontractors. Proper LogCAP contract performance by KBR is essential to the effective deployment, operation, morale and health of U.S. military forces in Iraq.

15

95.   On information and belief, there are over 50,000 KBR and subcontractor employees under LogCAP.[4]

96.   As noted above, the LogCAP Contract was originally issued in December 2001, well before the War in Iraq began.  The LogCAP Contract itself provided for little if any specific work.  Rather, it established the ground rules for LogCAP "task orders" that the U.S. Army issues to KBR.  Such task orders are awarded without competition.

97.   Task orders establish specific areas of contractor responsibility and activities.  Individual LogCAP task orders often have exceeded $50 million.

98.   For much of the relevant period, the largest LogCAP task order was Task Order 89.  Under this task order, KBR provides "theater transportation," logistics support services, base camp services, accommodations, "life support services," *etc.*   On information and belief, a substantial part of the services that *Qui Tam* Plaintiff Cassaday provided were provided under LogCAP Task Order 89.

99.   Over time, the U.S. Army has moved toward the issuance of omnibus task orders, covering periods of one year or less.  In August 2006, the U.S. Army issued a $3.5 billion LogCAP task order to KBR, for such work through September 2007.  Most of the LogCAP work now being performed corresponds to that task order.

100.   LogCAP was awarded as a 10-year contract, with one "base" year, and nine option years.  The U.S. Army has exercised options through December 2007.  The U.S. Army recently indicated, however, that it intends to replace LogCAP with other contract vehicles this year.  On

---

[4] The U.S. Army restricts the employment of Iraqis at U.S. military bases.  As a result, many LogCAP laborers are neither American nor Iraqi.  These are the TCNs.

information and belief, this is, at least in part, because of KBR's waste, fraud and abuse under LogCAP.

## IV.   <u>LogCAP Billing</u>

101.   LogCAP represents approximately half of KBR's contracting with the U.S. Government.

102.   By 2004, the value of LogCAP already was $10 billion. In 2005, because of the LogCAP contract, KBR was the U.S. Army's largest contractor. In 2006, LogCAP spending was approximately $400 million a month. At the end of 2006, the LogCAP backlog alone was $3 billion. On information and belief, cumulative billing to date is over $15 billion.

### A.     <u>The Cost-Plus-Award-Fee Structure</u>

103.   With minor exceptions not relevant here, LogCAP is a cost-plus-award-fee ("CPAF") contract, which is a type of cost reimbursement contract.

104.   Most of the services that KBR provides to the U.S. Government are governed by cost-reimbursable contracts. LogCAP is an example of this type of arrangement. Generally, these contracts contain both a base fee (a fixed profit percentage applied to actual costs to complete the work) and an award fee (a variable profit percentage applied to "definitized" costs, which is subject to the U.S. Government's discretion and tied to the specific performance measures defined in the contract). Base fee revenue is recorded at the time services are performed, based upon actual project costs incurred, and includes reimbursement for general, administrative, and overhead costs. Award fees are generally evaluated and granted periodically by the U.S. Government.

105.    More specifically, the Federal Acquisition Regulation ("FAR"), Title 48 of the Code of Federal Regulations, identifies a cost reimbursement contract as one providing "for payment of allowable incurred costs, to the extent prescribed in the contract." FAR 16.301-1.

106.    A CPAF contract pays the contractor not only allowable incurred costs permitted by the contract (as any cost reimbursement contract does), but also "a fee consisting of (a) a base amount . . . , and (b) an award amount, based on a judgmental evaluation by the Government." FAR 16.305; *see also* FAR 16.405-2.

107.    A CPAF contract, unlike a cost-plus-incentive-fee ("CPIF") contract, generally calculates the fee in relation to total allowable costs actually incurred under the contract, not target costs. Thus in a CPAF contract like LogCAP, there is no direct penalty for cost overruns (although the Government may consider cost-effectiveness when determining the award amount).

108.    The payment of an award fee, consisting of a base amount plus an award amount, is reflected in the LogCAP Contract, for instance at Contract Line Item Number ("CLIN") 0009, on Page 7 of the LogCAP Contract.

109.    The fact that LogCAP is a cost-reimbursement (specifically, CPAF) contract dictates the process by which KBR submits LogCAP claims for payment.  This is reflected in the contract by the inclusion of standard contract clause FAR 52.216-7, incorporated by reference on Page 36 of the LogCAP Contract.  Pursuant to this contract provision, KBR submits periodic claims for payment for: (i) its allowable, allocable and reasonable costs of contract performance; (ii) its "base fee," or profit, normally negotiated at the beginning of the contract as a percentage of "fee-bearing costs"; and (iii) its "award fee," also profit, which varies according to DoD's evaluation of KBR's performance.

110.   Paragraph A(H) on Page 3 of the LogCAP Contract provides for a maximum fee of 3%. The LogCAP base fee is 1% of allowable cost.  The "earned" award fee is up to 2% of cost, based on KBR's award fee score, as determined by the Award Fee Evaluation Board.  The procedure for determining the award fee is set forth in detail on Pages 11-17 of Attachment 002 of the LogCAP Contract.

111.   In 2006 alone, KBR received $120 million in LogCAP award fees.

112.   The U.S. Army has awarded KBR most, although not all, of LogCAP's 2% "earned" award fee.  Both the base fee and the "earned" award fee are calculated on the basis of KBR's allowable costs.


### B.   CPAF Incentives Under LogCAP

113.   Because of the CPAF structure of the LogCAP contract, whenever KBR commits waste, fraud or abuse totaling $1 million under LogCAP, this adds between $10,000 and $30,000 to its profit, with the figure normally closer to $30,000.

114.   The only constraint on this phenomenon – that KBR profits from LogCAP waste, fraud and abuse – is when KBR gets caught.  Getting caught can lead to the disallowance of costs submitted as allowable costs in LogCAP claims; the reduction in the percentage of the "earned" award fee; and the treble damages and penalties recoverable in this action, *inter alia*.  These remedial actions can occur, however, only when KBR gets caught.

115.   Other potential restraints on waste, fraud and abuse are essentially inapplicable to the LogCAP contract.

116.   Since, under LogCAP, DoD pays KBR all of KBR's reasonable costs, KBR has no incentive to minimize such costs.

117.   Since the task orders are awarded without competition, the normal constraint that competition imposes on waste, fraud and abuse has been eliminated.

118.   KBR is supposed to provide "cost or pricing data" with its task order proposals, to help DoD judge cost realism and reasonableness in the pricing of these task orders. The law requires that this cost or pricing data be current, accurate and complete.  On information and belief, however, KBR's cost or pricing information for LogCAP task orders is woefully deficient.

119.   As a result, KBR does not even try to economize on LogCAP expenditures.  On the contrary, KBR consciously endeavors to waste money, not only because KBR employees and managers enjoy the fruits of such waste (*e.g.,* excessive salaries, light workloads, featherbedding, luxurious "perks," etc.), but also because higher costs result directly in higher base and award fees.[5]

### C.     The Submission of Claims Under LogCAP

#### 1.     Certification

120.   The LogCAP Contract incorporates numerous standard clauses.  These include, but are not limited to, Command-specific contract clauses originally issued by the U.S. Army's Operations Support Command, and more recently by the U.S. Army's Sustainment Command.

121.   A number of these clauses prescribe that a "DD Form 250," a Material Inspection and Receiving Report, be submitted with each claim for payment under the contract.  This is true whether or not there is any material being inspected or received.

---

[5] As an example, alleged above, under LogCAP, KBR hires layer upon layer of lower-level "managers" with no special skills, and pays them up to and over $150,000 a year.  This is more than twice as much as the amount paid to many skilled engineers performing Government contracts in the United States.  KBR touts the fact that there is low turnover among such managers. The fundamental reasons for this low turnover are that KBR is overpaying them, and under-working them.

122.   The DD Form 250 contains an express certification that the contractor's performance conforms to the contract.

123.   In many cases, especially in recent years, the submission of DD Form 250s has been superseded by the electronic submission of equivalent claims for payment.  On information and belief, such electronic substitutes also expressly certify that the contractor's performance conforms to the contract.

124.   On information and belief, KBR's LogCAP claims for payment contain such certifications.

125.   Regardless of whether the contractor's claim expressly certifies that the contractor's performance conforms to the contract, the submission of the claim constitutes an implied certification that the contractor's performance conforms to the contract.

126.   When the contractor's performance does not conform to the contract, this certification is false or fraudulent.

## 2.   The LogCAP Claim Submission and Payment Process

127.   As noted above, Page 36 of the LogCAP Contract incorporates by reference the standard contract clause FAR 52.216-7.  Paragraph (a)(1) of that contract clause mandates that the contractor "submit to an authorized representative of the Contracting Officer . . . an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract."

128.   A variety of DoD entities are responsible for evaluating and processing KBR claims for payment under LogCAP.

129.   First, U.S. Army operational commands and subordinate commands are generally responsible for LogCAP contract administration.  These include the Army Materiel Command;

21

the Operations Support Command, in Rock Island, Illinois; the Army Sustainment Command ("ASC"); and ASC's LogCAP Support Unit, in Alexandria, Virginia.  Collectively, these are referred to as "AMC."  AMC negotiates and definitizes LogCAP task orders; monitors costs; and manages the award fee program, *inter alia.*

130.    Second, the Defense Contract Management Agency ("DCMA") conducts performance reviews, and manages contract "change orders," *inter alia.*  [The administrative "Contracting Officer," the official with formal authority to take action on behalf of the U.S. Government under the contract, often is a DCMA employee.]

131.    Third, the Defense Contract Audit Agency ("DCAA") reviews the overhead and general and administrative ("G&A") rates that KBR adds to its labor costs in its bills under LogCAP, and it audits incurred costs and subcontract costs, *inter alia.*

132.    Fourth, the LogCAP Contract provides, on the first page, that payment will be made by the Defense Finance & Accounting Service ("DFAS"), Rock Island Operating Location, Building 68, Rock Island, Illinois 61299.  KBR therefore knows that its LogCAP claims will be presented to DFAS, at that location.  On information and belief, DFAS further processed such claims in Cleveland or Columbus, Ohio; Indianapolis, Indiana; Kansas City, Missouri; or Denver, Colorado, *inter alia.*

133.    As a result, KBR knowingly presents claims, and causes the presentment of claims, to AMC, DCMA, DCAA and DFAS employees, *inter alia.*

134.    By law, such employees are officers and employees of the U.S. Government, or members of the Armed Forces of the United States.

135.    Generally, the U.S. Army pays LogCAP claims for payment from its Operations and Maintenance funds, a/k/a OMA funds (Operations and Maintenance, Army).  OMA funds

generally are appropriated funds. They are separate from the U.S. Army's military personnel, procurement, research and development and construction funds. They normally are a separate line item in the federal budget.

136.    Thus LogCAP claims are requests or demands for money or property for which the U.S. Government is providing a portion (indeed, all of it).

## First Claim - FALSE CLAIMS

137.    All of the preceding allegations are incorporated herein.

138.    As alleged above, during the period between the beginning of the applicable limitations period and the time that this lawsuit is resolved, KBR has performed under LogCAP.

139.    KBR has submitted LogCAP claims for payment to a variety of U.S. Government offices, as alleged in detail above. Each of these offices is staffed by officers or employees of the United States Government or members of the Armed Forces of the United States. Such KBR LogCAP claims have been received by such officers, employees and members. One or more of these claims has been presented in this judicial district.

140.    On information and belief, KBR billed the Government under LogCAP at least once each month, and as often as every two weeks. Each of these LogCAP invoices, from the beginning of the applicable limitations period and continuing through the resolution of this lawsuit, was, is and will be a false or fraudulent claim, for all of the reasons alleged above.

141.    KBR thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

## Second Claim - FALSE STATEMENTS

142.    All of the preceding allegations are incorporated herein.

143.    KBR knowingly made, used or caused to made or used numerous false records or statements to get the false or fraudulent claims paid or approved.  For instance, on information and belief, the Defendants knowingly falsified records for goods and services delivered, and government property.

144.    KBR thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

WHEREFORE, for each of these claims, the *Qui Tam* Plaintiff requests the following relief from each of the Defendants, jointly and severally:

A.      Three times the amount of damages that the Government sustains because of the acts of the Defendant;

B.      A civil penalty of $11,000 for each violation;

C.      An award to the *Qui Tam* Plaintiff for collecting the civil penalties and damages;

D.      Award of an amount for reasonable expenses necessarily incurred;

E.      Award of the *Qui Tam* Plaintiff's reasonable attorneys' fees and costs;

F.      Interest; and

G.      Such further relief as the Court deems just.

## Third Claim - RETALIATION

145.    All of the preceding allegations are incorporated herein.

24

146.   For the reasons alleged above, the *Qui Tam* Plaintiff was an employee who was discharged, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment by his employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of a False Claims Act action under this section.  This included his investigation for this action.

WHEREFORE, for this claim, the *Qui Tam* Plaintiff requests the following relief from each of the Defendants, jointly and severally:

A.   All relief necessary to make the *Qui Tam* Plaintiff whole;

B.   An order providing for reinstatement with the same seniority status that the *Qui Tam* Plaintiff would have had but for the discrimination, or in the alternative, front pay;

C.   Two times the amount of back pay and front pay;

D.   Interest on the back pay and front pay;

E.   Compensation for special damages sustained as a result of the discrimination, including but not limited to litigation costs and reasonable attorneys fees;

F.   Pre-judgment and post-judgment interest;

G.   Punitive damages; and

H.   Such further relief as the Court deems just.

## JURY REQUEST

The *Qui Tam* Plaintiff requests a jury for all issues that may be tried by a jury.

Respectfully submitted,
**HILDER & ASSOCIATES, P.C.**

/s/ PHILIP H. HILDER
Philip H. Hilder
State Bar No. 09620050
James Rytting
State Bar No. 24002883
819 Lovett Blvd.
Houston, Texas 77006
Telephone (713) 655-9111
Facsimile (713) 655-9112

**Of Counsel:**
Alan M. Grayson, Esq.
Grayson & Kubli, P.C.
1420 Spring Hill Road, Suite 230
McLean, VA 22102
(703) 749-0000

**ATTORNEYS FOR *QUI TAM* PLAINTIFF
FRANK M. CASSADAY**